UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI ALEJANDRO MENDOZA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　Defendant. | Case No.:  15cv1528 JAH (BGS)<br><br>**PRELIMINARY RULINGS, FINDINGS OF FACT AND CONCLUSION OF LAW** |

## INTRODUCTION

Plaintiff, Ali Alejandro Mendoza ("Plaintiff" or "Mendoza"), filed a complaint against the United States of America, the City of National City, Immigration and Customs Enforcement ("ICE") agent Thomas Malandris, Officer Benjamin Peck, and Officer Michael Nuttall for negligence, violations of California Civil Code §§52, 52.1 ("the Bane Act"), and four federal civil rights claims, pursuant to 42 U.S.C §§ 1983, 1985(2),(3), 1986, and *Bivens v. Six Unknown Agents of the Federal Bureau of Investigation*, 403 US 388. *See Doc. No*. 127.  After granting a joint motion to strike the *Bivens* claim from the Third Amended Complaint ("TAC") and a motion to sever the negligence claim, Plaintiff proceeded to trial on a single negligence cause of action against the United States of America ("Defendant") pursuant to the Federal Torts Claims Act.

Defendant filed motions *in limine* and attached exhibits to a declaration in support of the motions. *Doc. Nos*. 171-176. Plaintiff filed responses and a declaration in opposition, and Defendants replied. *Doc. Nos*. 177-182; 183-187.  On February 8, 2019, the parties appeared before this Court for a hearing on the motions *in limine*. *Doc. No*. 192.  The Court reserved ruling on two of the five motions until trial. *See Doc. No*. 193 at 5.

Trial commenced on February 26, 2019.  Proceedings were held through March 1, 2019, resumed from March 12, 2019 through March 14, 2019, and continued March 27, 2019 and March 28, 2019. Brief closing arguments were presented at trial. The Joint Exhibit List, Witness List, and Court Exhibit List were docketed by the Court. *Doc. Nos*. 227-229.  After transcripts of the proceedings were made available, the Court required the parties to file closing arguments in writing, citing to the record. Plaintiff filed his Opening Brief. *Doc. Nos*. 244, 248 (a redacted public version and an unredacted sealed version). Defendant filed its Responding Trial Brief and Plaintiff filed a Post-Trial Rebuttal Brief. *Doc. Nos*. 248, 252.  Having considered the evidence, heard oral argument, reviewed post-trial briefing and final joint trial exhibits, and the record, this Court makes the following rulings on the outstanding motions *in limine*, trial objections to testimony, findings of fact and conclusions of law.

**PRELIMINARY RULINGS**

**A. The Testimony of Dr. Monte Buchsbaum**

On February 28, 2019, Plaintiff filed a trial brief in response to the Government's cross examination of Plaintiff's expert witness Monte Buchsbaum. *Doc. No*. 200. The Government filed a reply. *Doc. No*. 202. However, as the Government notes, Plaintiff's brief requests no relief. It does not move to strike, does not distinguish the case[1] used [on cross examination] to challenge Buchsbaum's credibility, nor does it argue that

---

[1] Defendant introduced *Krynski v. Chase*, 06civ4766 AMD VMS, 2016 WL 1029498 (E.D. N.Y. March 8, 2016), in which the court found plaintiff's witnesses and hired experts, including Dr. Buchsbaum, were not credible.

Defendant's cross-examination of Dr. Buchsbaum was in any way improper. To the extent Plaintiff characterizes Defendants' cross examination as an objection to Plaintiff's use of Monte Buchsbaum as an expert, the Court disagrees. Defendant does not challenge the admissibility of Dr. Buchsbaum's opinions, only the weight to which such opinions should be given. Taking into consideration Buchsbaum's testimony, his education, experience, demeanor, demonstrative exhibits utilized to explain his testimony, and the extent his testimony was supported by other evidence, the Court has drawn its own reasonable inferences and credibility determinations in assessing the weight Buchsbaum's testimony deserves.

### B. Motion to Preclude Testimony from NCPD Sergeants

On November 13, 2018, Defendant filed a motion to preclude the testimony of NCPD Sergeants Parris Bull and Christopher Sullivan. *Doc. No*. 172. The court reserved ruling until trial. Neither witness was called by Plaintiff. Following the conclusion of trial proceedings, Defendant's motion was DENIED AS MOOT. *See Doc. No.* 257.

### C. Motion to Exclude Past Medical Expenses

GRANTED in part and DENIED in part. Per *Howell*, amounts billed for past services and the value of those services are capped at the amounts actually paid by Plaintiff or own his behalf. Any unpaid billings for past medical care and services and the value of those services are capped at the amount paid by Medicare. Past medical services rendered, despite their monetary value, are relevant as a factor(s) to be considered as to Plaintiff's mental and physical condition and resulting pain and suffering.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. The Collision

1. At all times relevant herein, ICE Deportation Officer, Thomas Malandris (Malandris), was employed by Defendant, the United States Government, and assigned to assist the National City Police Department with its law enforcement operations.

2. On the evening of July 12, 2014, at approximately 8:50 p.m., Malandris was driving an unmarked government issued Chevy Impala westbound on East 8th Street in the city of National City.

3. At the same time, Plaintiff and his friend, Alberto Morales, were walking westbound along East 9th Street and approached the intersection of 9th Street and D Avenue (hereafter the intersection). Plaintiff and Morales stopped at the curb.

4. Morales, who wore a light blue, neon shirt, saw no vehicles approaching from either direction and stepped off the curb and proceeded to cross the street in front of Plaintiff within the crosswalk.

5. While traveling on 8th Street and receiving a radio call concerning a home intrusion, Malandris made a southbound turn onto D Avenue.

6. Before stepping off the curb to follow Morales, Plaintiff saw the headlights of a vehicle, later determined to be driven by Malandris, a block away as it began to initiate a left turn from 8th Street onto D Avenue.

7. Plaintiff hurriedly entered the crosswalk to join and follow Morales.

8. The distance between 8th and 9th streets on D Avenue was approximately 300 feet. At 300 feet, one can see the ambient lighting by a streetlight that illuminated the southbound lane of the intersection. At 150 feet from the intersection, the lighting of the intersection in the southbound lane was very clear. There were no visual obstructions in the southbound lane between 8th and 9th street on D Avenue, including no visual interference created by trees, high vegetation, lamp posts or signage.

9. The crosswalk was clearly marked by two parallel lines. A pedestrian crosswalk sign was visible to Plaintiff and Morales on the southwest corner of the intersection.

10. Unbeknownst to Plaintiff, Malandris reached a speed of between 40 and 50 mph while approaching the intersection. Malandris admitted he was speeding.

11. Malandris' vehicle was equipped with headlights, emergency lights and sirens. The vehicle's headlights were activated. However, the vehicle's emergency lights/flashers

and sirens were not activated, even though Malandris was speeding in response to the "hot" or urgent call.

12. When Plaintiff got to the western portion of the crosswalk, nearly three-quarters away from the southwest curb, he noticed Malandris' vehicle coming upon him. He screamed, hurried to escape impact, and pushed Morales out of the vehicle's path.

13. Malandris saw Plaintiff and Morales in the intersection and slammed on his brakes.

14. Morales then heard the vehicle skidding and first saw headlights after Mendoza screamed and pushed him out of the way. Morales then felt the air flow created by the vehicle's side mirror as it whizzed by him.

15. Malandris failed to stop and collided with Plaintiff at a speed of between 20 and 25 mph.

16. Even if Morales was not there to be pushed out of the way, and despite his efforts to avoid contact himself, Plaintiff would still have been hit as he was struck in the approximate location where Morales found himself before Plaintiff pushed him.

17. The vehicle's initial impact was upon Plaintiff's leg. The plastic bumper cover over a metal structure on the front bumper of Malandris' vehicle had a dent - or indentation - near the upper corner on the right side of the license plate, indicating the vehicle's point of contact with Plaintiff's lower leg. That initial impact caused Plaintiff to be thrown shoulder-first onto the hood and then head-first into the windshield of Malandris' vehicle, causing a head-shaped indentation and spider crack on the windshield.

18. After his head struck the windshield, Plaintiff's momentum caused him to become airborne. He was tossed approximately 10 feet into the air and came to rest in the southbound lane in front of Malandris' vehicle.

19. At all relevant times, there was no evidence of on-coming vehicular traffic approaching the intersection or Malandris' vehicle from the opposite direction.

20. Malandris proceeded to assist plaintiff. He moved Plaintiff out of the street and unto the sidewalk on the southeastern side of the intersection – Plaintiff's original point of

entry into the intersection. Immediately thereafter, Malandris moved his vehicle from the point of impact and re-positioned it to a point facing northbound in the northbound lane of D Avenue.

21. Malandris' rendition of the facts was incredible and unreasonable in light of all of the evidence.

22. Moving Plaintiff and repositioning his vehicle precluded the collection of key evidence that would have assisted in assessing what caused the collision - including the actual point of impact, how far the vehicle traveled to a rest position after impact, and how far Plaintiff was propelled from the area of impact – and would have provided a better understanding, in an accident reconstruction context, of the speed of Malandris' vehicle and how much energy/force was applied to Plaintiff by the vehicle.

23. In September 2017, Plaintiff hurriedly left a residence in pursuit of a runaway dog, utilizing his skateboard without protective head gear in the process. Mendoza was advised against riding a skateboard and, if he did so, to wear a helmet in order to avoid re-injuring or enhancing the brain injury he suffered in the collision.

24. While skateboarding downhill, Plaintiff encountered bumpy pavement which caused him to be tossed approximately seven (7) feet in the air, landing on the pavement. Later in the emergency room, he was diagnosed with a concussion, received more than 20 stiches to his forehead and was required to stay overnight in the hospital for observation due to the diagnosis.

25. Clinical exams, including neuropsychological and neurological testing are the most accurate and efficient way to diagnose neurological disorders. Neuropsychology testing provides an objective analysis of issues such as memory problems, trouble concentrating, attention, and focus imagining, such as MRIs, PET scans, and CT scans are used to confirm clinical examination findings and not for diagnosis.

## II.   Cause of the Collison

26. Malandris was driving at an excessive speed in a residential neighborhood.

27. Malandris did not activate his emergency lights and siren while performing his official duties and failed to yield to protect pedestrians Plaintiff and Morales.

28. Malandris' post-collision conduct, including 1) moving Mendoza's body from the point of contact to the opposite side of the street, 2) moving his vehicle to the opposite side of the street, staging his path of travel in the northbound direction, and 3) misrepresenting the facts of the collision in his oral and written reports to NCPD and ICE, create a very strong inference of his consciousness of guilt.

29. Malandris' pre-collision as well as his post-collision actions were inconsistent with his training and his post-collision actions had the effect of destroying evidence and obstructing a proper vehicular injury investigation at the scene.

30. The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide, while whether the elements of breach of that duty and causation are proved are ordinarily questions of fact. *Vasquez v. Residential Inv. Inc.*, 118 Cal.App.4th 269, 279 (2004).

31. Cal.Veh.Code § 21950(a) provides that "[t]he driver of a vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked crosswalk, …except as otherwise provided by law.

32. A driver approaching a pedestrian within a marked or unmake crosswalk "shall exercise all due care and shall reduce the speed of the vehicle or take other action relating to the operation of the vehicle as necessary to safeguard the safety of the pedestrian. Cal. Veh. Code § 21950 (c).

33. The above provisions do not relieve pedestrians from exercising due care for their own safety.  No pedestrian may suddenly leave a curb or other place of safety and walk or run in the path of a vehicle that is so close as to constitute an immediate hazard. Cal.Veh.Code § 21950 (b).

34. "It is the duty of a pedestrian to exercise reasonable care while crossing a street in a marked cross-walk, and to continue to be alert to safeguard against injury, and such

duty continues throughout his passage." *Jeffs v. La Gore*, 131 Cal.App.2d 181, 185 (1955) (citing *O'Brien v. Schellberg*, 59 Cal.App.2d 764 (1943)).

35. Each person (pedestrian and driver) has a duty to use ordinary care and is liable for injuries caused by his own failure to exercise reasonable care in the circumstances. *Bily v. Arthur Young & Co.*, 3 Cal. App. 4th 370, 397 (1992).

36. The fact that a pedestrian is struck in a crosswalk by a driver does not establish negligence on the part of a driver as a matter of law. The driver's conduct must be reasonable under the circumstances. *Holmes v United States*, 2011 WL 1791596, (N.D. Cal May 10, 2011 (citing *Byrne v. City of and County of San Francisco*, 113 Cal.App.3d 731, 740 (1980)).

37. Defendant cites *Smith v. Sugich Co.*, 179 Cal.App.2d 299 (1960) and *Holmes*, 2011 WL 1791596 in support of its position that Plaintiff was not alert in crossing the street and was at some level of fault for the collision.

38. In *Smith*, both plaintiff and defendant had green lights to proceed through the intersection. The driver was halfway into a right turn and saw plaintiff for the first time a split second before the collision and applied his brakes as quickly as possible. Smith had taken about three steps into the intersection when impact occurred. Smith only looked straight ahead and did not look to see whether a car was turning in his direction. The driver did not see Smith until seconds before making his right turn. In addition, Smith "suddenly [left] a curb or other place of safety and [walked] … in the path of a vehicle that [was] so close as to constitute an immediate hazard." Cal.Veh.Code § 21950 (b).

39. In *Holmes*, a postal truck driver was stopped at a red light and activated a turn signal indicating a right turn. When the light turned green, the driver moved slightly forward to make the right turn and yielded to visible pedestrians in the crosswalk. Once all visible pedestrians cleared the crosswalk, the driver looked out of his right passenger window and the lower Fresnel lens to determine whether there were other pedestrians on the corner that might enter the crosswalk or whether there was anyone riding a

skateboard on the sidewalk. Upon determining the area was clear for the right turn, the driver returned his attention forward to complete the right turn and then felt a bump and heard streaming. He then saw a body - plaintiff's father - on the street and stopped his vehicle. Prior to the collision, plaintiff's father (decedent) was a double amputee operating a skateboard while sitting on his hips and propelling himself with his hands. Witnesses testified the decedent was weaving through people on the sidewalk while moving at the pace of a runner or jogger" before entering the crosswalk after the driver began making his right turn. While sitting on his skateboard, the decedent was approximately three feet, seven and one-half feet in height. Evidence also included the decedent's prior acts of recklessness in operation of the skateboard, including darting into traffic. The court found that the driver did not see the decedent at all even though he exercised care by carefully observing pedestrian traffic before making his turn. The decedent's actions created the immediate hazard.

40. Here, Malandris, unlike the drivers in Smith and Holmes, entered D Avenue a full block (300 feet) away as Plaintiff stepped into and hurried through the crosswalk.

41. Malandris had no reported obstructions to the intersection. He was traveling nearly twice the authorized speed limit for the neighborhood without activating his siren or emergency lights. Malandris collided with Plaintiff at a speed of 20 to 25 miles per hour, at or approximately twice the actual maximum speed allowable on D Avenue.

42. The evidence does not show any vehicular traffic approaching in the opposite direction. The evidence does not show that Malandris' line of sight to and through the intersection was obstructed. Defendant did not present any evidence challenging the accident reconstruction offered by Plaintiff. And, again, Malandris altered the accident scene by his post-collision actions.

43. Unlike the plaintiffs in Smith and Holmes, Plaintiff here did not run into the immediate path of Malandris' vehicle, and he was not in an area associated with a blind spot and thus did not create an immediate hazard to Malandris' operation of his vehicle. Plaintiff was moving quickly through the intersection in order to keep up with Morales and was

hit by Malandris while located approximately three-quarters of the distance to the opposite corner of the intersection where an operating, streetlight illuminated the surrounding area, including Plaintiff's location.

44. In *Smith* and *Holmes*, the drivers were abiding by the rules of the road. Here, Malandris was not.

45. The site of impact was at a point located nearly three-quarters of the distance in the cross walk with a streetlight on the approaching corner illuminating that side of the intersection and with the co-pedestrian wearing a light blue, neon shirt. Malandris should have been attentive to the circumstances along the roadway – whether speeding or not speeding – and should have taken other actions as necessary to avoid striking Plaintiff head-on in a situation involving no on-coming traffic.

46. The evidence establishes that Malandris did not do what reasonably was expected of a driver of ordinary prudence, acting under similar circumstances would have done by failing to "reduce the speed of the vehicle or take other action relating to the operation of the vehicle as necessary to safeguard the safety of Plaintiff. Cal.Veh.Code § 21950 (c).

47. Malandris' conduct was unreasonable in the circumstances. *Byrne*, 113 Cal.App.3d at 740.

48. Moreover, a reasonable law enforcement officer traveling at a high rate of speed through a neighborhood at approximately twice the speed limit would, in the circumstances, have activated his sirens and emergency flashes/lights to assist other officers during a "hot" or urgent call in order to provide notice to pedestrians and vehicles alike that he had an urgent, need to speed through the neighborhood. A reasonable officer would have or should have known that he was breaching his duty of care of ensuring pedestrians would not be harmed as a result of the exercise of his official duties.

49. On the other hand, the evidence established that Plaintiff exercised due care in entering the crosswalk as he did not run into the path of a vehicle that was so close as to constitute

an immediate hazard. Cal.Veh.Code § 21950 (b). Plaintiff observed Malandris in the process of making a left turn a block away from the intersection as he stepped off the curb and hurried through the intersection. A reasonable pedestrian observing a vehicle in the process of making a left turn a full block and 300 feet away would fairly assume the vehicle traveling within the speed limit in that residential neighborhood would not have caused him any danger by entering the path of travel before the vehicle completed its left turn.

50. However, Plaintiff's failure to continue to assess the circumstances during his passage through the crosswalk to protect himself was not reasonable under the circumstances, resulting in negligent conduct. *See Jeffs*, 131 Cal.App.2d at 185. He should have continually checked the status of the approaching vehicle. His attempt to assess the status of Malandris' vehicle just moments before the collision was not reasonable.

51. Malandris' actions and inactions were a substantial cause of the collision and plaintiff's injuries.

52. Under the circumstances, Plaintiff's actions and inactions represented a fifteen percent (15%) cause of the collision and his injuries.

**III. Injuries Suffered by Plaintiff**

53. In considering the measure of damages, the court considers the factors contained in Ninth Circuit Model Jury Instruction 5.2;

The nature and extent of Plaintiff's injuries;
The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future:
The mental, physical, emotional pain and suffering experienced and that with reasonable probability will be experienced in the future:
The reasonable value of necessary medical care, treatment, and services received to the present time;
The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;
The reasonable value of wages, earnings, earning capacity, salaries, employment, business opportunities, employment opportunities lost up to the present time;

The reasonable value of wages, earnings, earning capacity, salaries, employment, business opportunities, employment opportunities that with reasonable probability will be lost in the future.

54. As a result of the collision, Plaintiff suffered the following injuries:

   a. Orthopedic Injury

      i. Tibia Fracture

      ii. Minor Degloving Injury;

   b. Mild to moderate Traumatic Brain Injury (TBI) or Mild Concussion;

   c. Post-Traumatic Stress Disorder (PTSD); and

   d. Polytrauma Nature of Plaintiff's Impairments

   **1. Orthopedic**

55. Plaintiff's tibia was shattered in two locations and snapped in half. Plaintiff's closed tibia fracture was a serious injury.

56. While, structurally, the tibia healed as it should have after flawless surgery, the collision itself or the cutting of the subcutaneous nerves to repair the fracture resulted in a degloving injury, along with the post-operative scar tissue caused by the cutting of the nerves. The permanent damage resulting therefrom supports Plaintiff's self-report of post-operative and ongoing pain. There are associated risks of falling and experiencing imbalance and levels of pain resulting from the scar tissue and disconnecting of the nerves by the degloving. There is also associated pain to be experienced in biking or walking for more than 20 minutes and lifting/carrying heavy objects.

57. The nail/rod and screws placement in the repair of the tibia caused significant pain in the first twelve to eighteen months after surgery.

58. The removing the screws during the second surgery was a reasonable procedure to reduce pain under the circumstances.

59. Past orthopedic medical bills of approximately $141,560 are reasonable.

60. This injury has caused and will continue to cause Mendoza to be unable to work menial jobs, such as a dishwasher, an aid in a plastering firm, a bathroom attendant well as other occupations where he would be required to lift heavy objects as necessary for employment.

### 2.  Traumatic Brain Injury or Post-Concussive Syndrome

61. Mendoza's head injury from the July 2014 collision resulted in chronic headache disorder, trouble sleeping, mood changes, post-traumatic dystonia, PTSD, balance issues, photophobia, phonophobia, and cognitive changes and issues including attention-deficit disorders and other executive decision-making and performance-related functioning deficits.  He suffers from dystonia – a central nervous center disorder - of his hands.

62. The severity of the injury and post-concussive symptoms predict long term, persistent negative outcomes, and there is no medical certainty that the post-concussive symptoms will diminish.

63. The connecting fibers of Plaintiff's corpus callosum (between the two hemispheres of the brain) are frayed or disconnected and not functioning.  Due to his lack of proper functioning caused thereby, Mendoza has difficulty multi-tasking.  There is no treatment that returns the corpus callosum to its normal, pre-collision condition.

64. The injury to Plaintiff's frontal lobe will result in difficulty with memory, planning, reasoning, and problem solving.  The normal interaction between the frontal lobe and other areas of Plaintiff's brain are negatively and permanently altered by the collision.

65. Damage to the frontal lobe in the same or similar areas was determined to exist by two radiologists utilizing different types of imaging/methodologies.  The damage in these areas is consistent with psychological and cognitive deficits.  The Pet Scan results also support a finding that the brain damage is not treatable or repairable.

66. The classifications of mild, moderate and sever TBI as well as concussion are all synonymous with mild TBI.

67. Plaintiff has suffered non-medically treatable, permanent brain injury.

68. There is no reasonable medical certainty that Plaintiff will recover from his brain injury.

### 3. Post-Traumatic Stress Disorder (PTSD)

69. Plaintiff's near-death or life-threatening experience occasioned by the collision is consistent with PTSD, as defined by the DCM-V.
70. Plaintiff's symptoms associated with moderate to severe PTSD include flashbacks, mood changes, trouble sleeping, nightmares, intrusive memories, trouble in social relationships, depression, generalized fear responses (including fear of driving and paranoia involving vehicles), anxiety, irritability, difficulty writing, inability to maintain employment, inability to multi-task during employment and a significant negative impact in executive functioning.
71. Additionally, Plaintiff's PTSD symptoms manifest as a great amount of stress, night terrors, flashbacks, significant distress relating to contact with any form of law enforcement, paranoia around vehicles and trusting others and significant pain. These symptoms often mask as depression which may be life-long experiences as well. Even if Plaintiff had a history of depression, Defendant takes the Plaintiff as he found him pre-collision.
72. Damage to Plaintiff's temporal lobe in the frontal area of the brain is also associated with his PTSD symptoms.
73. Also, Plaintiff's PTSD has resulting impairments in interpersonal and employment relationships. Mendoza's post-collision work experience has been littered with failed attempts in various low wage positions due to the symptoms presented as a result of the collision, such as inattention to detail, inability to multi-task and deficit executive functioning.
74. No medical expert expressed concern with the veracity of Plaintiff's self-report of his symptoms. Most medical expert opinions were consistent regarding findings of identified symptoms.

75. Plaintiff's injuries and post-collision impairments are more severe than those attributable to impairments occasioned by Malandris.  In addition, Plaintiff's statistical age and life expectancy horizon differentiate Plaintiff's outcome from that of Malandris.

76. Any opinion that Plaintiff's PTSD is mild, requiring a maximum of one year of treatment, is not credible in light of Plaintiff's clinical course and all the evidence.

### 4. Polytrauma Nature of Plaintiff's Physical, Cognitive and Psychological Conditions

77. Plaintiff's TBI and PTSD, combined with pain in his leg - all occasioned by the collision - represent a multitude of simultaneously occurring medical conditions and resulting impairments thereby creating a polytrauma event.

78. Clinical examinations, including neuropsychological and neurological testing are the most accurate and efficient way to diagnose neurological disorders.  Imagining, such as MRIs, PET scans, and CT scans are used to confirm clinical examination findings and not for diagnosis.

79. While neuropsychological and neurological testing are the most accurate and efficient way to diagnose neurological disorders, Plaintiff's post-collision cognitive impairments were readily apparent to those who knew him well before the collision.  The observations and first-hand accounts of Plaintiff's family, former girlfriend, and friends – all familiar with Plaintiff before and after the collision - cannot be discounted.  This evidence more accurate than Plaintiff's self-report concerning the extent of the cognitive, neurological, and psychological symptoms due to the nature of the impairments caused by the collision.  Their observations are more descriptive, comprehensive, and fact-based when compared to Plaintiff's self-report. Specifically, the parents' observations of the cognitive changes in Plaintiff are based upon long-term experiences observing his behaviors.  Witness Jenkins' testimony concerning pre-collision observations and post-collision cognitive deficits in the workplace is similarly compelling.  Their observations are aligned with and provide significant support for the observations and opinions of Plaintiff's experts.

80. A majority of individuals experiencing TBI alone obtain some level of recovery. A majority of individuals experiencing PTSD alone may have positive outcomes regarding recovery or coping. However, the combination of TBI with Plaintiff's post-concussive PTSD symptoms creates a circumstance of non-recovery unlike the recovery prospects of stand-alone TBI or stand-alone PTSD.

81. Due to the polytrauma nature of Plaintiff's impairments, his post-collision work experience has been littered with failed attempts in various low wage positions due to his inattention to detail, inability to multi-task and his level of deficit executive functioning and is demonstrative of his future work life experiences.

### IV. Failure to Seek Vocational and Therapy-related Treatment

82. Plaintiff's PTSD is chronic in part because he has not received treatment.

83. In a polytrauma case like Plaintiff's, the decision not to seek treatment or follow through with treatment is not a conscious one as Defendant suggests. Rather, it is the product of a lack of trust in others, especially strangers such as therapists, about issues surrounding the re-living of his traumatic experience. Even if a patient, like Plaintiff, develops a good relationship with a therapist, continuing treatment is burdened by his decline in executive functioning, transportation issues and the lack of financial resources to continue treatment. These symptoms/issues have overwhelmed Plaintiff in light of his constellation of impairments and his failure to accept treatment to date that will cause him to fail to complete treatment if and when he accepts it.

84. The evidence shows an individual like Plaintiff with mild to moderate TBI and PTSD with the constellation of Plaintiff's medical, cognitive, and psychological disorders and symptoms will not 'darken the door' of a PTSD provider. The more significant biological systems that are pathological are disrupted, such as Plaintiff's permanent brain damage due to corpus callosum, frontal lobe damage and PTSD, the more difficult it would be for a PTSD professional to assist Plaintiff to achieve a reasonable level of recovery.

85. The evidence shows by a preponderance of the evidence that the combination of these impairments suffered by Plaintiff strongly suggest there will be very little to no benefit from vocational and therapy-related treatment even if such treatment was available and/or provided to him.

86. Plaintiff has shown by a preponderance of the evidence that Plaintiff's failure to seek vocational and therapy-related treatment has been induced by the collision and resulting impairments and has not been a conscious, knowing, and voluntary one.

### V.  Plaintiff's Academic, Educational and Career Capabilities

87. Plaintiff had pre-collision interests in certain subject matter occupations, such as music, law enforcement and psychology.  His lack of a clear career path was age appropriate. He developed a post-collision interest in material sciences upon undergoing the medical device treatment associated with his leg injuries.

88. The administration of the Wonderlic test, which is similar to the Wechsler test, and tests administered by Drs. Delis and Rosen exhibited above average or average to above average abilities.  Generally, the testing results placed Plaintiff in the 50-percentile area or mid-range of average.

89. The evidence shows that based upon tests results and his high school academic performance, Plaintiff did not have the capacity for being accepted into and completing a four (4) year college educational program.

90. Pre-collision, Plaintiff would have attained an Associate (A.A.) Degree by 2017 with earnings equivalent to that degree.

91. Plaintiff's post-collision disability burden results in a high propensity for less than full-time work. For example, multi-tasking - which is only one of his impairments - is required by most if not all forms of employment and Plaintiff's inability to do so materially and adversely affects his employability.  Plaintiff has a consortium or combination of impairments that cut across the physical, cognitive, and psychological categories.  While he may obtain employment, the retention of work over time is more difficult for a polytrauma-impaired individual, like Plaintiff, in that he will have more

difficulty with interpersonal relationships with co-workers and supervisory personnel, especially where co-workers and supervisors are unaware of the consortium of his impairments. To advise a prospective employer of the impairments, which PTSD individuals generally have difficulty in doing, realistically restricts job opportunities. And to so disclose his impairments subjects Plaintiff to opportunities in very menial levels of employment.

92. Plaintiff's academic background and capabilities, his polytrauma impairments and his inability to seek, accept and or benefit from treatment, subject him to a work-life loss of earnings of fifty percent (50%).

**VI.  Skateboard Accident**

93. Plaintiff was advised by his physicians and/or medical team against riding on a skateboard. He was also advised that, if he were to skateboard, he needed to wear a helmet so as to avoid enhancing the negative impact of his injuries obtained in the collision.

94. In September 2017, three years after the collision and against medical advice, Mendoza utilized a skateboard to pursue a runaway dog. He did not wear a helmet at the time.

95. The bumpy pavement caused Mendoza to fall off the skateboard and hit the pavement on his hands and face after flying in the air approximately seven feet. He was diagnosed with a concussion, received more than 20 stitches to his forehead, suffered a lower GCS score, and stayed in the hospital overnight for observation due to the concussion diagnosis.

96. Unlike the circumstances related to the initial polytrauma Plaintiff occasioned that impact his ability to seek and receive treatment for his PTSD, Plaintiff's actions of skateboarding downhill on a street at approximately 25 miles per hour without a helmet - despite express warnings from medical personnel to the contrary - was not caused by or represent a side effect of his PTSD. Plaintiff did not exercise reasonable care for his own safety under the circumstances.

97. Even though testing results disclosed limited to no additional damage to other areas of the brain, Plaintiff did not establish that this second concussion had no detrimental impact on the success of any recovery or future economic and non-economic damages.

98. An award of damages for cognitive and mental health impairments, including future economic damages after the skateboard incident should be reduced fifteen percent (15%) as being attributable to his future medical impairments and work life loss unrelated to the July 2014 collision.

**VII. Damages**

99. Based upon the foregoing, the total damage award to Plaintiff is $3,418,526 as follows:

   a.  <u>Pain and Suffering</u>: $2,237,000 - as follows

   1. From July 2014, up to September 2017 (date of skateboard incident): $637,500. This sum takes into account a fifteen percent (15%) reduction/off-set for Plaintiff's comparative negligence for the initial collision; and

   2. From October 2017 to the end of plaintiff's statistical life expectancy: $1,600,000. This sum takes into account a thirty (30) percent reduction for a) a fifteen percent (15%) reduction/off-set for Plaintiff's comparative negligence for the initial collision and b) a fifteen percent (15%) reduction/off-set due to the skateboard incident.

   b.  <u>Net Future Economic Damages</u> (Present Value) of $868,565, as follows:

   1.     Net earnings of $718,565 takes into account a) a discount rate to bring all future dollars into present value and a fifty percent (50%) work life loss, and b) a thirty percent (30%) reduction for 1) a fifteen percent (15%) reduction/off-set for Plaintiff's comparative negligence for the initial collision and 2) a fifteen percent (15%) reduction/off-set for the 2017 skateboard incident.

   2.     Net Future Medical Care in the amount of $171,500 or Medicare rate, whichever is less. This sum includes a) a discount rate to bring all future dollars into present value and b) a thirty percent (30%) reduction for 1) a fifteen percent (15%)

reduction/off-set for Plaintiff's comparative negligence for the initial collision and 2) a fifteen percent (15%) reduction/off-set for the 2017 skateboard incident. It does not include certain exotic treatments such as Bo-Tox injection treatment.

3. Vocational and Therapy-related Rehabilitation: $00.00. A vocational and therapy-related rehabilitation award is not ordered based upon the findings in paragraphs 78-82.

c. Past Medical Care: $141,460.

100. The damages award is reasonable. It is unreasonable to compare this award to other personal injury cases because, among a number of other reasons, 1) a comparison is not permitted under California law, *Di Rosario v. Havens*, 196 Cal.App.3d 1224, 1241 (1987); *Bigboy v. County of San Diego*, 154 Cal.App.4th 406 (1984), and 2) any such comparison is impossible without a closer examination of the facts, and the nature and extent of all injuries, including the physical, psychological and permanency of the injuries, age, medical condition - pre and post injury - of each plaintiff, and how these factors impact each plaintiff's work life.

IT IS SO ORDERED.

DATED: October 21, 2021

_____
JOHN A. HOUSTON
United States District Judge